WILLIAM H. KNIFFIN, as Trustee in Bankruptcy of C. H. EARLE, INC., Bankrupt, Appellant, *v.* THE STATE OF NEW YORK, Respondent.

(Claim No. 21770.)

Third Department, May 10, 1939.

*Lewis, Marks & Kanter [John T. Norton, Nathan Marks* and *Sidney Squire* of counsel], for the appellant.

*John J. Bennett, Jr., Attorney-General [Leon M. Layden, Assistant Attorney-General,* of counsel], for the respondent.

HILL, P. J. C. H. Earle, Inc., in August, 1928, contracted with the State of New York to construct about one and a half miles of bituminous macadam and one mile of reinforced concrete pavement, together with two bridges, all being a part of the Jones Beach Causeway on Long Island. The work continued until about July 25, 1929, when a petition in involuntary bankruptcy was filed against the corporation and the State suspended operations

under the contract. The trustee in bankruptcy has presented a claim to the Court of Claims demanding $181,788.58. The court gave judgment for $1,192.50, with interest amounting to $391.14. The claimant appeals.

Errors are urged concerning the following items.

Claimant asks $32,516.73, unpaid installment of moneys assigned before bankruptcy. A subcontractor obtained a judgment for this amount against the State, which has been paid and deducted from the balance due the claimant. The contractor, on May 17, 1929, assigned to a subcontractor moneys due and to become due under the contract, to be paid from the three succeeding estimates made by the State. Four estimates and payments were made after the assignment and before the bankruptcy, but only the first two installments were paid to the assignee. While the assignment recited that the three succeeding payments from the State would " become due on or about " respectively, June 1, July 1 and August 1, 1929, the four payments after the assignment were made by the State respectively on May 22 (from which the first installment under the assignment was paid), June 7, June 19 and the last July 9 (from which the second installment was paid). The trustee of the bankrupt contractor argues that the last installment not having been paid at the time of the bankruptcy, the subcontractor was a general creditor for that amount, and should not have been paid in full, being only entitled to the same percentage which other general creditors received, and that the State should pay the amount to the trustee for the benefit of all the creditors. With this we do not agree, but rather are in accord with the Court of Claims. General creditors through bankruptcy obtain liens comparable with those of judgment creditors with executions issued. An assignee of the money due or to become due under a contract for a public improvement has priority over all lienors whose claims are subsequently filed. (*McCorkle* v. *Herrman*, 117 N. Y. 297; *Bates* v. *Salt Springs National Bank*, 157 id. 322: *Riverside Contracting Co.* v. *City of New York*, 218 id. 596; *Anderson* v. *Hayes Construction Co.*, 243 id. 140; *Arrow Iron Works, Inc.*, v. *Greene*, 260 id. 330; *Scarsdale Nat. B. & T. Co.* v. *U. S. F. & G. Co.*, 264 id. 159.) Under the *Riverside* case (*supra*) the assignee became the owner of the assigned moneys, which were not subject to claims of general creditors through bankruptcy or otherwise.

Claim for excavating 71,233 cubic yards of earth disallowed by the Court of Claims. The plans required the pavement to be laid on an embankment about ten feet high, the minimum width at the bottom to be eighty feet, the top seventy feet,

forty feet to be occupied by the paved driveway with shoulders fifteen feet wide on either side. The material for the embankment was obtained by hydraulic dredging from the ocean bottom, a specified distance away from the embankment. The contract in reference to this item reads: " Item 121, approximate quantities 1,150,000 cubic yards in place for fifteen cents per cubic yard." The highway was to be constructed through a swampy area, in which the mud was ten to thirty feet deep. Through experience in other similar areas, it had been learned that an embankment of the kind projected would sink into the subsoil from one and a half to two feet. The claimant, in anticipation of this, pumped sufficient silt and sand from the sea bottom to raise the embankment from one and a half to several feet above the grade upon which the pavement was to be laid. After all of the settling had taken place, a considerable quantity of this excess material was removed and placed in piles at the side of the forty-foot roadbed, and it remained there until after the bankruptcy and the contract had been terminated. The State, in completing the work, moved these piles of material to the shoulders and slopes at a cost slightly in excess of fifteen cents a cubic yard. The claimant asserts that it should be paid for excavating the 71,233 cubic yards so used by the State under a provision of the contract, " Item No. 4, quantity 7700 cubic yards unclassified excavation for one dollar a cubic yard," as this yardage was excavated either when it was dredged from the ocean bottom or when removed from the top of the embankment to permit the laying of the pavement at the grade fixed by the engineers. " Unclassified excavation " is defined in the specifications which are a part of the contract. It is the removal of earth and other material originally on the line of the proposed highway to obtain the given grade, and from the places for incidental structures like culverts, underdrains and catch basins, and for the emplacement of the piers, abutments and wings in connection with bridges. This yardage does not come within that classification. It was pumped by the dredges in anticipation of a possible settling of the embankment and with the thought that the excess would be available for shoulders and slopes. It was ultimately used for this, but the cost to the State was such as to preclude a recovery even at fifteen cents a cubic yard. The decision of the Court of Claims should be affirmed.

Claim for $4,932, additional compensation for the excavation and removal of 1,233 cubic yards of material from the bottom of coffer-dams built in connection with the construction of the piers to support the bascule span of bridge No. 3, shown in many photo-

graphic exhibits. It is stipulated " that the fair and reasonable cost to the contractor for the performance of such excavation work was $6,165." Claimant has received only $1,233, leaving the balance mentioned, and it is further stipulated that if the court determines it to be " wet excavation " claimant is entitled to the amount asked. The specifications provide, " Wet excavation * * * will be paid for only in the building of walls, abutments and piers in connection with bridge structures. * * * It shall cover only the excavation below the water surface at the time excavation is made." A witness for the State describes the coffer-dams, " Well, as the sheet piling was driven around the center well frames, as they call them — We treat that as the well. And sheet piling was driven down so that the elevation of the top came to elevation plus 4 about. Well, then the cofferdam was de-watered and piles driven — timber piles were driven down to the approximate grade. And then the material — when the piles were driven, the confined material had no place to go and it latterly was all heaved up over the piles and it had to be removed in order to get the excavation down to elevation minus 20, which was the bottom of the pier." The excavation was done by hand, some of the men wearing rubber boots. There were 240 piles driven inside each pier. The following evidence was also given by the same witness: " Q. The work had to be done by hand? A. It had to be done by hand, yes, sir. Q. Now I ask you if the plans show any excavation at this particular point? A. Yes, sir. Q. Can you find it readily; so that we can just put the general information on the record? [Witness examines plans.] Q. Well, we won't wait for you to find it. A. All right, I can't find it now. I don't believe it — I don't believe that the specification shows the level or the elevation of the pier. But the pier had to be set to minus 20." Another witness for the State testified: " Q. This material — or can you state where this material came from that was excavated? A. It was originally the bay bottom." From the record in part quoted it appears that a wooden frame was con-structed in the water, which was designated " the well," obviously full of water from the photographs of the bridge and piers, and inside this a cofferdam was built by driving sheeting, the bottom being several feet (—20) below the bed of the stream, as the earth excavated was a part of the " bay bottom." The water was pumped from the inclosure and piles driven, forcing the material of the bottom of the bay, together with some water, up inside the dam. The work was in cramped quarters where progress was slow and below the water surface outside the cofferdam. The State

argues for a construction that the material must be taken from underneath and below the surface of water. If this were the correct construction, then the hydraulic pumping of silt and sand from the ocean bottom onto the embankment would be classified as "wet excavation." The specifications classify the excavation done in connection with building the walls, abutments and piers of bridges as "wet." Such structures can only be built within cofferdams from which the water has been pumped, but the excavating is done "below the water surface" not below the surface of the water. It is stipulated that the claimant expended $4,932 more than it was paid for this work. The judgment should be increased by that amount, with interest from August 1, 1929.

Claim for $35,000, increased cost for ashlar masonry over cost of contract requirement for rubble masonry in the bascule towers of bridge No. 3. This claim arises because State inspectors required the contractor to face the bascule towers, foundations and sills with ashlar, while the contract provided for rubble in part, and further, because when the State took over the contract, it continued to use the higher cost type. The claimant had built the foundations and sills along the entire length of the pier and four to six feet of the towers which, when completed, would have been something over forty feet above the water level. The State finished the construction of the towers and charged the cost against the balance due the contractor. All of the masonry installed was ashlar. The type is discernible from the photographs. The contract provided concerning that type of masonry "stones shall be accurately cut to shape and dimensions. Within thirty days after the awarding of the contract the contractor shall prepare and submit to the engineer for approval completed details of the ashlar which he proposes to use. Outside surfaces shall be rock faced with projections not exceeding 1½"." The contract required that the outside of these piers should be "faced with stone masonry. This does not include the front curtain walls extending from elevation +4 to elevation +18 which are reinforced concrete. Quoins (exterior angles), voussoirs (the tapering or wedge-shaped pieces of stone used in constructing the arches), tops and sides of door and window openings, window sills, and water table courses shall be ashlar. Other masonry shall be rubble." The most favorable evidence from the standpoint of the State is that under the contract and plans the four bascule towers would require eight cubic yards of ashlar masonry in the foundations, sills and water tables (including the first course on top of the piers), and thirty-two cubic yards of ashlar masonry in the superstructure, and that there would be

fifty-seven cubic yards of rubble masonry. The latter type is described in the contract (Item 111). Only one-fourth of the stones are required to be "header stones." The wall was to be built true, the joints were to be broken, projections of four inches were allowed, stones were to be laid on their natural beds, joints and crevices to be pinned and wedged and flushed with mortar, and there was to be produced "an irregular rubble effect approximately the same as that given by the Wilmot Road bridge." One defense interposed by the State is that the ratio between ashlar and rubble which existed in the Wilmot bridge applied here. There is no basis for such an assertion. The only reference to similarity with the Wilmot bridge I have quoted above. It is contained in the paragraph of the contract margined "rubble stone masonry" and the requirement is it was to be laid so as to obtain approximately the irregular rubble effect given by the Wilmot bridge. The other defense which was accepted by the Court of Claims is predicated upon a finding (No. 84) that a State engineer was shown a wall thirty-eight to forty feet in length and two and a half to three feet high, which was constructed of ashlar, and the court found that as the contractor had begun to build the tower and foundation of ashlar, it was proper to require that the entire structure be of that type. The only wall thirty-eight to forty feet in length and two feet high which the engineer could have inspected was the sill and water table built along the entire top of the piers. The sides of the bascule towers above the water table were slightly less than fifteen feet in length, thus he could not have been looking at those. The contract and specifications required that the sills and water table should be constructed of ashlar. For this purpose, eight cubic yards were required. The ashlar in the towers, under the contract, was to be only thirty-two cubic yards, while the rubble, as earlier stated, was fifty-seven yards. Answering an argument made by the State: While it is true that the towers complete were bid at a unit price (111), this bid contemplated that they were to be surfaced part ashlar and part rubble, and a separate item (112) fixed sixty dollars a cubic yard as the value of the stone masonry facing, which figure should be used in fixing the amount of damages which must be ascertained arithmetically. Witnesses say that ashlar costs four times as much as rubble. Plaintiff's engineer gave actual figures that the labor alone on 1.36 cubic yards of ashlar cost $368. The evidence will sustain a finding that ashlar does cost four times as much as rubble. The combined types of masonry were bid at sixty dollars a cubic yard. There was an aggregate of ninety-seven cubic yards (fifty-seven

rubble, forty ashlar — eight cubic yards in the sills and water table, thirty-two cubic yards in the towers). The cost of this at the price bidden would have been $5,820. Using that total cost and the quantities stated, ashlar should be paid for at $107.28 per cubic yard. Claimant's estimate of quantities is favorable to the State, as the estimate attached to the contract was one hundred and sixty cubic yards. The entire ninety-seven cubic yards having been built of ashlar, the cost, computed as above on the price bidden, was $10,406.16, an excess of $4,586.16 above the cost had the contract requirements been followed. The judgment should be increased by that amount, with interest from the filing of the claim on January 21, 1931.

Claim for $1,500 for driving and removing two test piles in connection with bridge No. 4. From the evidence adduced, I am unable to find liability on the part of the State.

Claim for $868.56 for concrete used in the construction of driving heads placed on the tops of concrete sheet piles during the driving process. These were built after conversations between representatives of the State and employees of the claimant, in which, the State's witnesses say, claimant agreed to pay for these appurtenances and not to ask reimbursement from the State. The Court of Claims has accepted that version, and the finding is not against the weight of the evidence. It should be affirmed.

Sixty-six dollars and eighty-seven cents is asked for reconstructing forms for the concrete tops of piles of that material which had been driven. The evidence sustains the finding of the Court of Claims that some of these forms were out of alignment because of displacement of the piles owing to the failure of the contractor properly to brace and guy them directly after they were driven. The item should be disallowed.

Claim for $937.08, moneys expended by the contractor in the alignment of piles. The contractor asserts liability because of failure by State surveyors to give proper locations. The State asserts that the contractor was under an obligation to drive the piles as indicated on the plans and further, that the contractor moored some of his floating equipment to the piles already driven before they had been guyed and stay-lathed, with the result that the piles were moved through this careless act of the contractor. There is evidence to sustain each theory. I am not prepared to say that the decision of the Court of Claims is error, and favor an affirmance.

Claim for $265.31, demurrage on scows which had been loaded with stones or rip-rap to be placed around crib work or for fills

where the tides would ebb and flow. Two tugboats had towed the barges to the north abutment of bridge No. 3, where stones were to be placed, according to the plans and specifications. The representative of the State prevented this, the tugs, barges and scows were held for several days before a place to dump the stones was selected by the State. The explanation by the State's witnesses does not impress me, as the stones were finally accepted for use at a nearby location, and the contractor, using rented equipment, should not have been required to keep it floating idly for the number of days shown. I believe that the claim should be allowed and the judgment increased by the amount claimed.

Claim for $31,994.51. This is the cost of 592,491 pounds of reinforcing rods and steel at five and a fourth cents a pound, which were used in the building of the pre-cast (not in forms located at the point of use) concrete piles. The bid on piles of this character is contained in the proposal made by the contractor which forms a part of the contract. The State was to pay eight dollars and fifty cents a linear foot for twenty-four-inch piles and six dollars a linear foot for eighteen-inch piles. The specifications provided " payment for * * * pre-cast concrete piles shall include the cost of furnishing all materials (except Portland cement), equipment, labor and other items necessary for casting, curing and driving the piles as ordered." This steel was a component part of the piles and its cost was included in the proposals made by the contractor. The claim should be disallowed.

Claim for $889.92, for additional metal reinforcing bars in the beams, decks and floors of bridges 3 and 4. Under the plans and specifications, these bars were to be placed four inches apart, and the surface of each bar to have a prescribed area. Those first placed by the contractor did not have the required area. An additional number of bars was required to compensate for the lack in area of those placed four inches apart. The claim should be disallowed.

Judgment should be given in accordance with the foregoing.

Crapser, Bliss and Heffernan, JJ., concur.

The judgment of $1,192.50 awarded by the Court of Claims on September 27, 1935, together with interest of $391.14 to that date, should be increased, under the law and facts, by $9,783.47, with interest on $4,932 thereon from August 1, 1929, and upon $4,851.47 from January 21, 1931, and as so modified, the judgment should be affirmed, with costs to the appellant.

The court reverses the following findings contained in the decision made by the Court of Claims: Nos. 75, 76-a, 81, 82, 83, 84, 85,

90, 91, 92, 94, 95, 96, 166, 168, 169, 172, 173 and 174, together with all comparable findings contained in the State's requests to find. The court makes the following findings of fact: Concerning the 1,233 cubic yards of wet excavation, Nos. 63 to 71, both inclusive, of claimant's requests to find; concerning the masonry item, findings 72 to 82, both inclusive, 79 and 82 being modified by striking out the amount $26,880, and substituting therefor $4,586.16; concerning the stone fill or rip-rap, findings 153 to 163, both inclusive, of claimant's requests to find.

Judgment modified, as above set forth, and as so modified affirmed, with costs to the appellant.